UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

RADAMES DURAN, *on behalf of himself and all others
similarly situated*,

　　　　　　　Plaintiff,

　　　　v.

LA BOOM DISCO, INC.,

　　　　　　　Defendant.

**17-cv-6331 (ARR) (CLP)**

**Opinion & Order**

ROSS, United States District Judge:

　　　　Radames Duran ("plaintiff") brings this action against La Boom Disco, Inc.

("defendant") for alleged violations of the Telephone Consumer Protection Act (TCPA), 47

U.S.C. § 227. Plaintiff claims that defendant, a nightclub in Queens, N.Y., sent him numerous

text messages over a two-year period in violation of the TCPA. Plaintiff is seeking summary

judgment on the issue of defendant's liability. Because I find that defendant's communications

do not fall under the TCPA as a matter of law, plaintiff's motion for summary judgment is

denied. Further, since the parties have fully briefed the issue of whether defendant's text

messages are covered by the TCPA, I am sua sponte granting summary judgment in favor of

defendant.

## BACKGROUND

　　　　On March 19, 2016, plaintiff texted defendant the word "TROPICAL" in response to an

advertisement defendant had placed on Facebook. *See* Pl.'s 56.1 ¶ 8, ECF No. 20-1; Def.'s 56.1

¶ 8, ECF No. 39; Pl.'s Br. 1, 8, ECF No. 21.[1] Plaintiff texted defendant in order to receive free

---

[1] Defendant's records and memorandum of law indicate that plaintiff texted defendant on March 19, 2016. *See* Lee
Decl. in Supp. Pl.'s Mot. Summ. J. Ex. B, at 12–13, ECF No. 24-2; Def.'s Br. 5–9, ECF No. 41. Although plaintiff

admission to a particular event taking place at defendant's nightclub. *See* Pl.'s 56.1 ¶ 8; Def.'s

56.1 ¶ 8; Pl.'s Br. 1. After plaintiff texted defendant, he received the following response:

> You Been Added To The Saturday Nite Guest List @ LaBoomNY.com
> FREE ADMISSION til 12am w/txt
> Must be 21+/Valid for 1
> 718-204-2069
> Reply STOP Tropical 2 Optout

Lee Decl. in Supp. Pl.'s Mot. Summ. J. ("Lee Decl.") Ex. B ("Def.'s Records"), at 12–13, ECF

No. 24-2. Plaintiff's text gained him free admission to an event, as well as added him to

defendant's mass text list for Saturday night events. *See id.*; *see also* Pl.'s Br. 8; Lee Suppl. Decl.

in Supp. Pl.'s Mot. Summ. J. ("Lee Suppl. Decl.") Ex. B ("Najera Dep."), at 16:2–17:10; 19:9–

20:2, ECF No. 44-2. Over the next couple of years, plaintiff received over 100 text messages

from defendant. *See* Pl.'s Br. 8–9; Def.'s Br. 9; Pl.'s 56.1 ¶¶ 2–3; Def.'s 56.1 ¶ 3.[2] The text

messages advertised events at defendant's nightclub and encouraged plaintiff to buy tickets. *See*

Lee Decl. Ex. A ("Def.'s Texts"), ECF No. 24-1; Najera Dep. 19:20–20:2.[3] Some messages

contained opt-out instructions, *see, e.g.*, Def.'s Texts 8–22, while others did not, *see, e.g., id.* at

1–8.[4] At any point, if plaintiff had replied "stop," "cancel," or "unsubscribe," he would have

---

recalls that he texted defendant in October 2015, plaintiff accepts defendant's date of March 19, 2016, for the purposes of this motion. *See* Pl.'s Br. 8. In defendant's response to plaintiff's 56.1 statement, defendant refers to the date of plaintiff's text as March 19, *2017*. *See* Def.'s 56.1 ¶¶ 2, 8 (emphasis added). Because the remainder of the record asserts a date of March 19, 2016, I assume the "2017" is a typographical error.

[2] Plaintiff contends that he received 296 texts. *See* Pl.'s Br. 8–9; Pl.'s 56.1 ¶¶ 2–3. Defendant asserts that it sent only 121 texts. *See* Def.'s Br. 9; Def.'s 56.1 ¶ 3. The record does not provide a definitive answer. While this dispute would be material if defendant were found liable, because I conclude that defendant is not liable as a matter of law, the number of texts is not material.

[3] Examples of text messages plaintiff received include: "Saturday Oct 28th Performing LIVE TEGO Calderon, FATJoe, TITO El Bambino, NORIEL, LITO, DjProStyle, DjLobo / Buy tickets now: 718-204-2069 bit.ly/RGHorrorFest" and "2nite Celebrity Bday Party @LaBoomNY 4 djSussone MusicBy Prostyle Dj Kazzanova Dj Envy COME CELEBRATE YOUR BIRTHDAY! FREE ADMISSION B4 12am w/txt 718-204-2069." Def.'s Texts 1–2.

[4] Plaintiff is able to reproduce only 50 of the text messages he received for the court. *See* Pl.'s Br. 5; Def.'s Texts. I assume that the 50 text messages are representative of the remaining text messages, because neither party argues to the contrary.

been removed from defendant's mass text list. *See* Najera Dep. 39:2–7; Patel Aff. ¶ 22, ECF No. 28-1.

Defendant texted plaintiff using the ExpressText and EZ Texting programs (collectively, "the programs"). *See* Pl.'s 56.1 ¶ 5; Def.'s 56.1 ¶ 5; *see also* Def.'s Br. 9 (conceding that it sent plaintiff 108 texts using ExpressText and 13 texts using EZ Texting).[5] ExpressText COO Ashish Patel testified that "numbers can get uploaded to the [ExpressText] system either through the client's direct upload of phone numbers, or the client can advertise short codes that end-subscribers can text to in order to opt in and have their numbers added to the client's database." Lee Suppl. Decl. Ex. E ("Patel Dep."), Errata Sheet at 1, ECF No. 44-5. In this case, plaintiff's number was automatically added to defendant's database through the EZ Texting program when plaintiff texted "TROPICAL" to defendant. *See* Def.'s Records 12; Najera Dep. 16:15–19; *see also* Najera Dep. 36:2–12 (noting that when individuals are added to the database, they receive an automatic text message notifying them that they have been added). Once numbers are in a user's database, the user can organize the numbers into groups and send mass text messages to the groups. *See* Pl.'s Br. 14–16; *see also* Patel Dep. 10:10–12 ("[The users] create their own content for the text message, select the groups that they prefer to send to and then send their message."). The ExpressText platform allows users to send the same message to thousands of people with one click. *See* Patel Dep. 11:16–20; *see also* Pl.'s Br. 15. Users can send the message immediately or schedule a future time for the message to go out. *See* Pl.'s Br. 15; *see also* Najera Dep. 40:7–11 ("I upload [the message] to the system . . . [and] tell them when . . . I want it to go out."). Before sending a message, users must certify that they are in compliance with the TCPA. *See* Patel Dep., Errata Sheet at 2; Pl.'s Reply 6, ECF No. 43. The ExpressText

---

[5] Defendant will be referred to as both the "client" and the "user" of the programs.

and EZ Texting programs function in substantially the same way. *See* Pl.'s Br. 16; *see also Ramos v. Hopele of Fort Lauderdale, LLC*, 334 F. Supp. 3d 1262, 1275 (S.D. Fla. 2018) ("The EZ-Texting system cannot send a text without a person physically inputting numbers, drafting a message, selecting recipients, choosing a date and time to send the message, and manually hitting a 'send' button."), *appeal docketed*, No. 18-14456 (11th Cir. Oct. 22, 2018).

On October 31, 2017, plaintiff filed a class-action complaint alleging that he received "unsolicited and unconsented-to" text messages from defendant in violation of the TCPA. Compl. ¶ 1, ECF No. 1. Plaintiff filed an amended complaint on March 8, 2018, containing the same allegation. *See* Am. Compl. ¶ 1, ECF No. 13. On May 15, 2018, plaintiff moved for summary judgment on the issue of defendant's liability under the TCPA. *See* Mot. Summ. J., ECF No. 20. On May 17, 2018, Magistrate Judge Pollack issued an order staying the briefing schedule on plaintiff's motion until discovery in the case was complete. *See* Electronic Order, May 17, 2018. The stay was lifted on September 18, 2018, *see* Scheduling Order, ECF No. 38, and defendant submitted its opposition to plaintiff's summary-judgment motion on October 16, 2018, *see* Def.'s Br. For the following reasons, plaintiff's motion for summary judgment is denied, and summary judgment in favor of defendant is granted sua sponte.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The function of the court is not to resolve disputed factual issues but to determine whether there is a genuine issue to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "While genuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, materiality runs to whether the dispute matters, i.e., whether it concerns

facts that can affect the outcome under the applicable substantive law." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation marks and ellipses omitted) (quoting *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)).

The moving party carries the burden of proving that there is no genuine dispute respecting any material fact and "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223–24 (2d Cir. 1994). Once this burden is met, in order to avoid the entry of summary judgment, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998) (citing *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525–26 (2d Cir. 1994)). In reviewing the record before it, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997).

"When one party has moved for summary judgment, 'a court may grant summary judgment in favor of the non-moving party provided that [the moving] party has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried.'" *Weissman v. Collecto, Inc.*, No. 17-CV-4402 (PKC) (LB), 2019 WL 254035, at *3 (E.D.N.Y. Jan. 17, 2019) (quoting *Radut v. State St. Bank & Tr. Co.*, No. 03 Civ. 7663(SAS), 2004 WL 2480467, at *2 (S.D.N.Y. Nov. 4, 2004)). Although the Second Circuit has advised district courts to give "clear and express notice" before granting summary judgment in favor of the nonmoving party sua sponte, notice is not required if the moving party will not be "procedurally prejudiced" by the lack of notice. *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 139 (2d Cir. 2000). "A party is procedurally prejudiced if it is surprised by the district court's action

and that surprise results in the party's failure to present evidence in support of its position." *Id.*

The risk of procedural prejudice "greatly diminishe[s]" when the court's decision "is based on issues identical to those raised by the moving party" and "the moving party speaks to those issues in the course of the district court proceedings." *Id.* at 140 (quoting *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991)); *see also Obsession Sports Bar & Grill, Inc. v. City of Rochester*, 235 F. Supp. 3d 461, 466 (W.D.N.Y. 2017) ("Movant has 'sufficient notice' . . . where the issue upon which the court grants summary judgment for the non-movant is the same issue that the movant briefed in support of its unsuccessful motion for summary judgment." (citing *Geraczynski v. Nat'l R.R. Passenger Corp.*, Civil Action No. 11-6385 (SRC), 2015 WL 4623466, at *7 (D.N.J. July 31, 2015))), *aff'd*, 706 F. App'x 53 (2d Cir. 2017). Further, when it is clear from the record that the moving party has submitted all of the evidentiary materials it might submit in response to a motion for summary judgment, "a *sua sponte* grant of summary judgment against that party may be appropriate if those materials show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law." *Bridgeway Corp.*, 201 F.3d at 140 (citing *Ramsey v. Coughlin*, 94 F.3d 71, 74 (2d Cir. 1996); *see also id.* ("[W]hen the moving party cannot plausibly claim that, had it been given notice of the district court's consideration of summary judgment against it, it would have brought forth additional evidence, the district court's failure to give notice is harmless . . . .").

## DISCUSSION

The TCPA makes it:

> unlawful for any person . . . (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . (iii) to any. . . cellular telephone . . . unless such call is made solely to collect a debt owed to or guaranteed by the United States.

47 U.S.C. § 227(b)(1). The statute defines an "automatic telephone dialing system" ("ATDS" or "autodialer") as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id.* § 227(a)(1). As the statute makes clear, there are three exceptions to the general prohibition on autodialer calls: (1) a call made for emergency purposes, (2) a call made with the prior express consent of the called party, and (3) a call made to collect government debts. *Id.* § 227(b)(1)(A). The TCPA provides for a private right of action allowing a plaintiff to recover $500 for each violation or $1500 if the violation is willful or knowing. *Id.* § 227(b)(3).

The Federal Communications Commission ("FCC") is responsible for interpreting the TCPA's reach. In 2003, the FCC issued an order clarifying that the TCPA's prohibition on autodialer "calls" encompasses both voice calls and text messages. *See* Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14,014 ¶ 165 (2003) [hereinafter 2003 Order].[6] Further, in 2015, the FCC explained that the term "called party" "include[s] . . . individuals who might not be the subscriber, but who, due to their relationship to the subscriber, are the number's customary user and can provide prior express consent for the call." Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 30 FCC Rcd. 7961 ¶ 75 (2015) [hereinafter 2015 Order]. Because plaintiff is the "non-subscriber customary user of the mobile number" defendant texted, Pl.'s 56.1 ¶ 4,[7] defendant is liable to plaintiff for violating the TCPA unless (1) defendant did not use an ATDS

---

[6] The parties do not dispute that defendant's text messages constitute "calls" under the TCPA.

[7] Plaintiff claims that his phone number is part of a family plan subscribed to by his mother and that he was the "non-subscriber customary user" of the phone number defendant texted. *See* Pl.'s 56.1 ¶ 4. In response, defendant "[a]dmits that the Plaintiff is a *non-customary* user on his Mothers Metro PCS account, during the times alleged." Def.'s 56.1 ¶ 4 (emphasis added). Because of defendant's admission and the lack of a dispute over this issue in the record, I assume "non-customary" was an error and that defendant meant "non-subscriber customary user."

or (2) one of three enumerated exceptions applies. The exception at issue in this case is consent. *See also* Def.'s Br. 4–5 (identifying the number of texts, whether defendant utilized an ATDS, and whether plaintiff consented to defendant's texts as the sole issues of material fact). I will first address whether plaintiff consented to defendant's text messages, and I will then turn to whether the programs at issue meet the statutory definition of an ATDS.

## I.  Defendant cannot avoid TCPA liability on the ground that plaintiff consented to the text messages.

In 2012, the FCC issued a rule that "established a two-tier system of consent, with the two tiers being 'prior express consent' and 'prior express *written* consent.'" *Rotberg v. Jos. A. Bank Clothiers, Inc.*, 345 F. Supp. 3d 466, 477 (S.D.N.Y. 2018) (quoting 47 C.F.R. § 64.1200(a)). While calls that do not contain advertisements or constitute telemarketing require only the "prior express consent" of the called party, 47 C.F.R. § 64.1200(a)(1), callers seeking to use an ATDS to make a "call that includes or introduces an advertisement or constitutes telemarketing" must obtain "prior express written consent," *id.* § 64.1200(a)(2); *see also Van Patten v. Vertical Fitness Grp.*, 847 F.3d 1037, 1045 (9th Cir. 2017); *Rotberg*, 345 F. Supp. 3d at 477; *Zani v. Rite Aid Headquarters Corp.*, 246 F. Supp. 3d 835, 843–44 (S.D.N.Y. 2017), *aff'd*, 725 F. App'x 41 (2d Cir. 2018). Prior express written consent requires:

> [A]n agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

47 C.F.R. § 64.1200(f)(8). The FCC defines "advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services," *id.* § 64.1200(f)(1), and "telemarketing" as "the initiation of a telephone call or message for the purpose of encouraging

the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person," *id.* § 64.1200(f)(12). The calling party bears the burden of demonstrating prior express written consent. *See Van Patten*, 847 F.3d at 1044; Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 27 FCC Rcd. 1830 ¶ 33 (2012).

Defendant appears to argue that the "prior express consent" standard governs this case and that defendant received such consent when plaintiff provided his phone number to defendant. *See* Def.'s Br. 14–16. Defendant relies on *Van Patten* to support its argument; however, *Van Patten* is not applicable because the alleged conduct in *Van Patten* took place before the 2012 rule requiring prior express written consent for advertising and telemarketing calls took effect. *See Van Patten*, 847 F.3d at 1045 ("Because the alleged conduct here took place before the rule took effect . . . , Defendants need not have obtained prior express *written* consent from [plaintiff]."). While defendant is correct that giving one's number to a caller satisfies the "prior express consent" standard for non-advertising and non-telemarketing calls, *see Rotberg*, 345 F. Supp. 3d at 477–78, the only text in this case that was not an advertising or telemarketing text was defendant's initial text to plaintiff granting him free admission to a particular event. *See* Def.'s Records 12–13. The subsequent texts—which advertised events at defendant's nightclub and encouraged plaintiff to purchase tickets (*see* Def.'s Texts)—clearly fall under the FCC's definition of "advertisement" or "telemarketing." Thus, while plaintiff's act of giving his number to defendant constituted sufficient consent to receive the initial text, this action did not grant defendant permission to send subsequent advertising and telemarketing texts. *See, e.g.*, *Larson v. Harman Mgmt. Corp.*, No. 1:16-cv-00219-DAD-SKO, 2016 WL 6298528, at *1, *3–4 (E.D. Cal. Oct. 27, 2016) (rejecting the argument that by sending the text "BURGER" to defendant to receive a free burger, plaintiff provided "prior express written consent" to receive subsequent

advertising and telemarketing texts). Here, defendant has not met its burden of demonstrating prior express written consent for the advertising and telemarketing texts. Thus, defendant cannot avoid liability on a consent theory.[8]

## II. ExpressText and EZ Texting do not qualify as autodialers as a matter of law, and summary judgment against plaintiff is therefore appropriate.

The TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). The question of what qualifies as an ATDS "has generated substantial questions over the years." *King v. Time Warner Cable Inc.*, 894 F.3d 473, 481 (2d Cir. 2018) (quoting *ACA Int'l v. FCC*, 885 F.3d 687, 701 (D.C. Cir. 2018)). The FCC and the courts have attempted to clarify the definition of an ATDS through various administrative orders and judicial opinions, but the definition remains unclear. I find it useful to provide an overview of the relevant orders and opinions in order to arrive at my understanding of the law. I ultimately conclude that the pre-2015 FCC guidance on autodialer functions remains good law, and that under this guidance, the ExpressText and EZ Texting programs do not qualify as autodialers.

### A. Autodialer definition

#### i. The 2003 FCC Order

In 2003, the FCC addressed whether "predictive dialers" are autodialers. *See* 2003 Order, *supra*, ¶¶ 129–33. "A predictive dialer is an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that 'predicts' the

---

[8] To the extent that defendant argues that plaintiff provided adequate consent by not opting out of receiving defendant's texts, *see, e.g.*, Def.'s Br. 6, this argument fails. *See, e.g., Larson*, 2016 WL 6298528, at *1, *4–5 (reasoning that advertising and telemarketing messages with opt-out options still require "prior express written consent").

time when a consumer will answer the phone and a telemarketer will be available to take the call." *Id.* ¶ 8 n.31; *see also id.* ¶ 131 ("[A] predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls."). The FCC noted that "in most cases, telemarketers program the numbers to be called into the equipment." *Id.* ¶ 131. Members of the telemarketing industry argued that predictive dialers do not qualify as autodialers because they do not dial "randomly or sequentially," i.e., (1) they dial from a database of numbers, and (2) they dial "in a manner that maximizes efficiencies for call centers." *Id.* ¶ 130.

The FCC rejected the industry members' argument and held that predictive dialers do fall under the statutory definition of an ATDS. Regarding the use of a database of numbers, the FCC wrote:

> In the past, telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily. As one commenter points out, the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective. . . .
>
>     . . . [T]o exclude . . . equipment that use[s] predictive dialing software from the definition of "automated telephone dialing equipment" simply because it relies on a given set of numbers would lead to an unintended result.

*Id.* ¶¶ 132–33. Thus, the FCC reasoned, while early autodialing equipment created and dialed numbers on its own, technology has developed such that equipment that relies on lists of numbers is more effective, and technological advances should not enable telemarketers to avoid TCPA liability. In response to the claim that predictive dialers are not autodialers because they do not dial numbers arbitrarily, the FCC noted that "the basic function of [early autodialing equipment and predictive dialers] . . . has not changed—the *capacity* to dial numbers without human intervention." *Id.* ¶ 132. In other words, there is no substantive difference between

predictive-dialing software and software that dials numbers randomly or sequentially, because both dial numbers without human intervention. *See also id.* ¶ 131 n.432 ("Some dialers are capable of being programmed for sequential or random dialing; some are not" (quoting industry comments)).

I interpret the 2003 Order as holding that a piece of equipment can constitute an autodialer if it relies on a list of numbers, so long as the equipment also has the capacity to dial those numbers without human intervention. This reading comports with the FCC's implication that predictive dialers qualify as autodialers because of the pairing between the database of numbers and the predictive-dialing software, i.e., the component of the equipment that operates without human intervention. *See, e.g., id.* ¶ 131 ("[A] predictive dialer is equipment that dials numbers and, *when certain computer software is attached*, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, *when paired with certain software*, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." (emphases added) (footnotes omitted)); *id.* ¶ 133 ("[T]o exclude . . . equipment *that use[s] predictive dialing software* from the definition of 'automated telephone dialing equipment' simply because it relies on a given set of numbers would lead to an unintended result." (emphasis added)). The FCC's subsequent orders, which focus on the absence of human intervention as the defining characteristic of an autodialer, lend further support to my interpretation of the 2003 Order. *See* Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 23 FCC Rcd. 559 ¶¶ 12–13 (2008) [hereinafter 2008 Order] (rejecting the argument "that a predictive dialer meets the definition of autodialer only when it randomly or sequentially generates telephone numbers, not when it dials numbers from customer telephone lists," and noting that it had already found "that the evolution of the

teleservices industry had progressed to the point where dialing lists of numbers was far more cost effective, but that the basic function of such dialing equipment, had not changed—the capacity to dial numbers without human intervention"); Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 27 FCC Rcd. 15,391 ¶ 2 n.5 (2012) [hereinafter 2012 Order] ("The Commission has emphasized that [the definition of an ATDS] covers any equipment that has the specified *capacity* to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists."). A number of district courts agree that under the FCC's 2003, 2008, and 2012 Orders, a device that relies on a database of numbers can qualify as an ATDS and that the critical feature of an ATDS is the capacity to dial those numbers without human intervention. *See Ramos*, 334 F. Supp. 3d at 1270, 1272–73 (collecting cases).

### ii.    The 2015 FCC Order and *ACA International*

In 2015, the FCC again addressed the statutory definition of an autodialer. *See* 2015 Order, *supra*, ¶¶ 10–24. The FCC mainly focused on the meaning of the word "capacity" under the statute. *See* 47 U.S.C. § 227(a)(1) (defining an ATDS as a device that has "the *capacity*—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers" (emphasis added)). Adopting a broad interpretation, the FCC held that the TCPA's reach extends to devices with the "potential ability" to function as an autodialer. 2015 Order, *supra*, ¶ 19; *see also id.* ¶ 15 (noting that "the TCPA's use of 'capacity' does not exempt equipment that lacks the 'present ability' to [function as an autodialer]"). In *ACA International*, the D.C. Circuit invalidated several aspects of the 2015 Order, including the FCC's definition of "capacity." *See* 885 F.3d at 695–700. The court found that extending TCPA liability to equipment with the future capacity to meet the definition of an autodialer "invites the

conclusion that all smartphones are autodialers." *Id.* at 699. Thus, the court held, the FCC's "interpretation of the statute . . . is an unreasonably, and impermissibly, expansive one." *Id.* at 700.

The D.C. Circuit also struck down the portion of the 2015 Order describing the requisite functions of an autodialer, reasoning that the FCC offered competing explanations that "fail[ed] to satisfy the requirement of reasoned decisionmaking." *Id.* at 702–03. The court noted that by reaffirming its 2003 Order, the FCC appeared to confirm its prior determination that "equipment can meet the statutory definition [of an autodialer] . . . even if it has no capacity itself to generate random or sequential numbers (and instead can only dial from an externally supplied set of numbers)." *Id.* at 702 (citing 2015 Order, *supra*, ¶¶ 12–14). The court also found, however, that the language of the 2015 Order implied that an ATDS must have the capacity to generate random or sequential numbers on its own. *See id.* at 701–02. The 2015 Order twice states that autodialer equipment must have the capacity to "dial random or sequential numbers." *See id.* (citing 2015 Order, *supra*, ¶¶ 10, 15). The D.C. Circuit determined that "it is clear from context that the [2015] order treats the ability to 'dial random or sequential numbers' as the ability to *generate* and then dial 'random or sequential numbers.'" *Id.* at 702. The court explained why:

> [T]he [2015] ruling distinguishes between use of equipment to "dial random or sequential numbers" and use of equipment to "call[] a set list of consumers." Anytime phone numbers are dialed from a set list, the database of numbers must be called in *some* order—either in a random or some other sequence. As a result, the ruling's reference to "dialing random or sequential numbers" cannot simply mean dialing from a set list of numbers in random or other sequential order: if that were so, there would be no difference between "dialing random or sequential numbers" and "dialing a set list of numbers," even though the ruling draws a divide between the two. It follows that the ruling's reference to "dialing random or sequential numbers" means generating those numbers and then dialing them.

*Id.* (citations omitted) (first quoting 2015 Order, *supra*, ¶ 10; then citing 2015 Order, *supra*, ¶¶ 13–14). The court went on to state that the 2003 Order "reinforce[s] th[e] understanding" that "the [2015 Order's] reference to 'dialing random or sequential numbers' means generating those numbers and then dialing them," because in the 2003 Order, the FCC also drew a distinction between "calling from a list of numbers" and "'creating and dialing' a random or arbitrary list of numbers." *Id.* ("In its 2003 ruling addressing predictive dialers, the Commission observed that, '[i]n the past, telemarketers may have used dialing equipment to *create and dial* 10-digit telephone numbers arbitrarily.' But the industry had 'progressed to the point where' it had become 'far more cost effective' instead to 'us[e] lists of numbers.'" (quoting 2003 Order, *supra*, ¶ 132)). Thus, the D.C. Circuit concluded, because the FCC "espouse[d] . . . competing interpretations in the same order" regarding whether a device must be able to generate random or sequential numbers to qualify as an autodialer, the 2015 Order was not "consistent with reasoned decisionmaking." *Id.* at 703.

The D.C. Circuit also found that the 2015 Order included a contradictory discussion of the "human intervention" factor. *See id.* at 703 (noting that the FCC reiterated its holding that the "'basic function' of an autodialer is the ability to 'dial numbers without human intervention'" but also declined to "clarify[] that a dialer is not an autodialer unless it has the capacity to dial numbers without human intervention" (quoting 2015 Order, *supra*, ¶¶ 14, 17, 20)). Thus, the court concluded: "The order's lack of clarity about which functions qualify a device as an autodialer compounds the unreasonableness of the Commission's expansive understanding of when a device has the 'capacity' to perform the necessary functions. We must therefore set aside the Commission's treatment of those matters." *Id.*

### iii.    The Impact of *ACA International*

In *King v. Time Warner Cable*, the Second Circuit examined the D.C. Circuit's decision in *ACA International* and concluded, "[a]lthough we are not bound by the D.C. Circuit's interpretation of the statute, we are persuaded by its demonstration that interpreting 'capacity' to include a device's 'potential functionalities' after some modifications extends the statute too far." *King*, 894 F.3d at 477. Thus, the Second Circuit held "that the term 'capacity' is best understood to refer to the functions a device is currently able to perform, whether or not those functions were actually in use for the offending call, rather than to devices that would have that ability only after modifications." *Id.* Regarding the functions a device must possess in order to qualify as an autodialer, the Second Circuit declined to weigh in and deferred to the district courts. *See id.* at 481 ("[T]he D.C. Circuit noted that the role of the phrase, 'using a random or sequential number generator,' has generated substantial questions over the years, which the FCC's 2015 Order failed to conclusively resolve. To the extent that applying the narrower definition of 'capacity' that we adopt today necessitates that those complicated questions be answered in the present case, we leave it to the district court to address them in the first instance." (quotation marks and citation omitted)); *id.* at 481–82 (noting that "the FCC expressly declined to adopt [a human-involvement] standard in its 2015 Order" and "ventur[ing] no opinion on whether . . . lack of human involvement is a consideration relevant to [plaintiff's] claims"); *see also Rotberg*, 345 F. Supp. 3d at 477 n.3 (declining to resolve the question of whether an autodialer must be able to generate random numbers to be dialed at the motion-to-dismiss stage and noting that the *King* court "recognized this is a 'complicated question[]' and expressly declined to answer it"(quoting *King*, 894 F.3d at 481)).[9]

---

[9] In *King*, the Second Circuit remanded the case to the district court because the district court relied on the incorrect definition of "capacity" in granting partial summary judgment for plaintiff. *See King*, 894 F.3d at 481. The case

Currently, federal courts are in disagreement over whether *ACA International*'s invalidation of the 2015 Order also "invalidated the analogous portions of the 2003 and 2008 Orders concerning predictive dialers." *Richardson v. Verde Energy USA, Inc.*, No. 15-6325, 2018 WL 6622996, at *4 (E.D. Pa. Dec. 17, 2018); *see also id.* at *4–5 (collecting cases and noting that a majority of lower courts have held "that the earlier Orders remain binding on federal courts"); Pl.'s Reply 12–14 (collecting cases upholding the validity of the 2003 and 2008 Orders). A number of courts have claimed that the Second Circuit, in *King*, "adopted th[e] position" that "by invalidating the 2015 Order, the D.C. Circuit necessarily invalidated the 2003 and 2008 Orders as well." *Richardson*, 2018 WL 6622996, at *5; *see also Peralta v. Rack Room Shoes, Inc.*, No. 18-3738, 2018 WL 6331798, at *5 (E.D. La. Dec. 3, 2018); *Adams v. Ocwen Loan Servicing, LLC*, No. 18-81028-CIV-DIMITROULEAS, 2018 WL 6488062, at *3 (S.D. Fla. Oct. 29, 2018); *Grogan v. Aaron's Inc.*, No. 1:18-CV-2821-AT, 2018 WL 6040195, at *5 (N.D. Ga. Oct. 26, 2018). I respectfully disagree with this interpretation of *King*. The *King* court wrote:

> [T]he FCC's 2015 Order . . . broadly construed the term "capacity" . . . . In the wake of *ACA International*, which invalidated that Order and thereby removed any deference we might owe to the views the FCC expressed in it, we must decide independently whether the district court's broad understanding of the "capacity" a device must have in order to qualify as an ATDS under the TCPA is a supportable interpretation of the statute. We conclude that it is not.

---

subsequently settled. *See* Notice of Settlement, *King v. Time Warner Cable, Inc.*, No. 14-cv-2018 (AKH) (S.D.N.Y. Sept. 13, 2018). In remanding the case, the Second Circuit wrote:

> The record does not permit us to conclude, as a matter of law, that Time Warner's system has the requisite 'capacity,' as we understand it, to meet the definition of an autodialer regulated by the TCPA. Nor does it permit us to conclude the opposite. On the present record, we do not know whether Time Warner's system had the ability to perform the functions of an ATDS when it made the calls to King, nor what kinds of modifications might be required to permit it to do so.

*King*, 894 F.3d at 481. While the court concluded that it did not have enough information to determine whether the system at issue met the statutory definition of an ATDS, it also declined to clarify what functions a system must perform in order to meet this definition. *See id.*

*King*, 894 F.3d at 476–77. While the Second Circuit plainly held that the 2015 Order had been invalidated, the court nowhere explicitly addresses the validity of the prior FCC Orders.[10] The courts that hold that *King* invalidated the prior FCC Orders seem to reason that by rejecting the FCC's views in the 2015 Order and turning to the statutory language itself, the Second Circuit "implicitly disavowed the continuing viability of the 2003 and 2008 orders as concerns the definition of an ATDS." *Peralta*, 2018 WL 6331798, at *5; *see also Grogan*, 2018 WL 6040195, at *6 (noting that in the wake of *ACA International*, "courts appear to either interpret an ATDS according to (1) the definition as espoused in the 2003 and 2008 FCC orders; or (2) the statutory language itself").

The Second Circuit, however, only analyzed the meaning of "capacity" under "the statutory language itself." As discussed earlier, the court declined to weigh in on the requisite functions of an autodialer. Importantly, the invalidation of the 2015 Order does not have the same impact on "capacity" as it does on autodialer functions. Regarding "capacity," the

---

[10] The Third Circuit also declined to take a stance on the continuing validity of the prior FCC Orders, holding only: "In light of the D.C. Circuit's holding, we interpret the statutory definition of an autodialer as we did prior to the issuance of 2015 Declaratory Ruling." *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 119 (3d Cir. 2018). However, "[p]rior to the *Dominguez* case, the Third Circuit had never interpreted the statutory definition of an ATDS." *Richardson*, 2018 WL 6622996, at *5. In *Dominguez*, "the Third Circuit held, albeit implicitly, that a device must *itself* have the ability to generate random or sequential telephone numbers to be dialed." *Id.* at *7 (quotation marks omitted) (quoting *ACA Int'l*, 885 F.3d at 701); *see also Dominguez*, 894 F.3d at 120–21.

Unlike the Second and Third Circuits, the Ninth Circuit made clear that in the wake of *ACA International*, "the FCC's prior orders on [the issue of the definition of an ATDS] are no longer binding on [it]," *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1049 (9th Cir. 2018), *petition for cert. filed*, No. 18-995 (Jan. 28, 2019), reasoning that the D.C. Circuit "reopened consideration of the definition of ATDS established in the FCC's [prior Orders]" and that the invalidation of the 2015 Order also invalidated "any prior FCC rules that were reinstated by the 2015 [O]rder," *id.* at 1047, 1049. The *Marks* court thus "look[ed] at the context and the structure of the statutory scheme" and determined that the "language in the statute indicates that equipment that made automatic calls from lists of recipients was also covered by the TCPA." *Id.* at 1051. While neither the Third nor the Ninth Circuit opinions are binding on this court, they shed light on the complex legal landscape surrounding *ACA International* and the TCPA's definition of an autodialer. *See also Maes v. Charter Commc'n*, 345 F. Supp. 3d 1064, 1069 (W.D. Wis. 2018) (questioning the *Marks* court's conclusion that the D.C. Circuit "invoked jurisdiction" to review the prior FCC Orders and noting that even if it did, "the [D.C. Circuit] did not actually review them" but rather limited its analysis and holding to the 2015 Order).

invalidation of the 2015 Order forces courts to analyze "capacity" under the statute, because the FCC had not offered prior guidance on the term.[11] The FCC had, however, offered prior guidance on requisite autodialer functions, *see* 2003 Order, *supra*, ¶¶ 129–33; 2008 Order, *supra*, ¶¶ 12–13; 2012 Order, *supra*, ¶ 2 n.5, so the invalidation of the 2015 Order does not necessarily send courts back to the statute to analyze these functions. I understand the Second Circuit's statement that "an administrative interpretation of the statute . . . has now been invalidated" and it must "consider the meaning of the statute independently, without an administrative interpretation to defer to" as limited to the meaning of the term "capacity." *King*, 894 F.3d at 482 (holding that "the best interpretation of the statutory language is the one suggested by the D.C. Circuit's discussion in *ACA International*: in the TCPA's definition of an autodialer, a device's 'capacity' refers to its current functions absent additional modifications"). I find support for this interpretation in the Second Circuit's decision not to mention the prior FCC Orders or weigh in on the functions an autodialer must possess. *See id.* at 481–82. Thus, the critical question for the courts in this circuit is whether invalidating the 2015 Order implicitly invalidates the analogous portions of the prior FCC Orders discussing autodialer functions. For the following reasons, I conclude that it does not.

---

[11] *See, e.g.*, 2015 Order, *supra*, ¶ 11 (noting that businesses are seeking clarification on whether the term "capacity" is limited to the "current capacity" or "present ability" of the dialing equipment, without further modification). In the 2015 Order, the FCC says that its prior orders on predictive dialers demonstrate that "autodialers need only have the 'capacity' to dial random and sequential numbers, rather than the 'present ability' to do so." *Id.* ¶ 15 (citing 2003 Order, *supra*, ¶¶ 132–33). The 2003 Order, however, left open the question of whether a predictive dialer becomes an autodialer only after the predictive-dialing software is added and utilized. *See* 2003 Order, *supra*, ¶ 131 ("[A] predictive dialer is equipment that dials numbers and, when certain [predictive-dialing] software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls."); *id.* ¶ 133 ("[T]o exclude . . . equipment that use predictive dialing software from the definition of [ATDS] simply because it relies on a given set of numbers would lead to an unintended result."); *see also* Marks, 904 F.3d at 1046 (noting that the FCC, in its 2015 Order, "went . . . further" than it had before in "determin[ing] that a device could have the requisite capacity [to function as an autodialer] if it had any potential to be configured for that purpose" (citing 2015 Order, *supra*, ¶ 15)).

While courts in this circuit do not appear to have addressed the issue, a growing number of courts in other circuits have. *See, e.g.*, *Richardson*, 2018 WL 6622996, at *4–5 (collecting cases). Many courts have upheld the validity of the prior FCC Orders, in large part because *ACA International* does not clearly address the validity of these Orders. *See, e.g.*, *Reyes v. BCA Fin. Servs., Inc.*, 312 F. Supp. 3d 1308, 1321 (S.D. Fla. 2018) ("[N]owhere in the D.C. Circuit's opinion are the prior FCC orders overruled."); *see also Richardson*, 2018 WL 6622996, at *4 (collecting cases); Pl.'s Reply 12–14 (same). Courts finding that the invalidation of the 2015 Order implicitly invalidates the prior FCC Orders generally engage in a two-part analysis. First, the courts cite to the D.C. Circuit's holding that the 2015 Order is invalid because it offers competing views as to whether an autodialer must be able to generate random or sequential numbers. *See Thompson-Harbach v. USAA Fed. Sav. Bank*, No. 15-CV-2098-CJW-KEM, 2019 WL 148711, at *10–11 (N.D. Iowa Jan. 9, 2019); *Richardson*, 2018 WL 6622996, at *5; *Pinkus v. Sirius XM Radio, Inc.*, 319 F. Supp. 3d 927, 934–35 (N.D. Ill. 2018); *Sessions v. Barclays Bank Del.*, 317 F. Supp. 3d 1208, 1212–13 (N.D. Ga. 2018). Second, the courts conclude that the 2003 Order must also offer a competing view, because as the D.C. Circuit noted, both the 2003 and 2015 Orders drew a distinction between numbers that are randomly or sequentially generated and numbers that come from lists. *See Thompson-Harbach*, 2019 WL 148711, at *11; *Richardson*, 2018 WL 6622996, at *5; *Pinkus*, 319 F. Supp. 3d at 935; *Sessions*, 317 F. Supp. 3d at 1212.

This line of reasoning is incorrect. As discussed earlier, the 2003 Order clearly holds that equipment that calls from a list can meet the statutory definition of an autodialer. *See supra* Section II.A.i–ii; *see also Maes v. Charter Commc'n*, 345 F. Supp. 3d 1064, 1069 (W.D. Wis. 2018). While the D.C. Circuit did bring attention to the 2003 Order's distinction between

randomly or sequentially generated numbers and a list of numbers, it did so only to reinforce its understanding of the 2015 Order, i.e., that the FCC's use of "dialing random or sequential numbers" meant "generating those numbers and then dialing them." *See ACA Int'l*, 885 F.3d at 702. Only the 2015 Order contained a contradiction, however, by stating that equipment must have the capacity to "dial random or sequential numbers" in order to qualify as an autodialer. *See supra* Section II.A.ii; *see also Maes*, 345 F. Supp. 3d at 1068 ("[T]he flaw in the 2015 ruling was not that it reaffirmed the 2003 order, but that it both reaffirmed the 2003 order and contradicted it."). In fact, the D.C. Circuit expressly declined to endorse either interpretation of an autodialer. *See ACA Int'l*, 885 F.3d at 702–03 ("The 2015 ruling . . . gives no clear answer (and in fact seems to give both answers). It might be permissible for the Commission to adopt either interpretation. But the Commission cannot, consistent with reasoned decisionmaking, espouse both competing interpretations in the same order."). Because the logic behind invalidating the 2015 Order does not apply to the prior FCC Orders, I conclude that the invalidation of the 2015 Order does not implicitly invalidate the prior FCC Orders. *See also Maes*, 345 F. Supp. 3d at 1068–70 (finding the same). I will therefore continue to rely on those Orders to interpret the definition of an autodialer.

### B.  ExpressText and EZ Texting

As discussed earlier, I interpret the prior FCC Orders as holding that equipment can meet the definition of an autodialer if it pulls from a list of numbers, so long as the equipment also has the capacity to dial those numbers without human intervention. *See supra* Section II.A.i. Plaintiff concedes that the programs at issue lack the ability to generate randomized or sequential numbers. *See* Pl.'s Br. 16 ("Their websites do not indicate that these systems have the capacity to actually 'produce' telephone numbers 'using a random or sequential number generator.' Rather,

the automated text messaging works off of a pre-established list of numbers that have been uploaded into the system." (citation omitted)); *see also* Patel Aff. ¶¶ 8–9 (stating that ExpressText "does not have the ability to generate randomized or sequential lists of contact cell phone numbers" and "does not dial cell phone numbers or send text messages sequentially or randomly"); *Ramos*, 334 F. Supp. 3d at 1265 ("[T]he CEO of . . . the company that owns the EZ-texting program[] confirms that the program can only be used to send messages to specific identified numbers that have been inputted into the system by the customer . . . [and] does not have the ability to . . . generate phone numbers."). Because I do not understand the prior FCC Orders as requiring random or sequential number generation, I do not find that the programs' reliance on a database of numbers disqualifies them from TCPA coverage; rather, I conclude that they do not qualify as autodialers because they are not capable of dialing numbers without human intervention.

There is no dispute that for the programs to function, "a human agent must determine [the time to send the message], the content of the messages, and upload the numbers to be texted into the system." Pl.'s Reply 16; *see also* Pl.'s Br. 14–16; Patel Dep. 10:10–12; Najera Dep. 40:7–11. Plaintiff argues that these programs operate without human intervention because "the user does not have to 'click' before each number is dialed. Rather, the user can simply direct the system to fire off thousands of texts at a designated time." Pl.'s Reply 16. Neither the FCC Orders nor the relevant case law support plaintiff's understanding of what it means to operate without human intervention. When the FCC expanded the definition of an autodialer to include predictive dialers, the FCC emphasized that "[t]he principal feature of predictive dialing software is a *timing* function." 2003 Order, *supra*, ¶ 131 (emphasis added). Thus, the human-intervention test turns not on whether the user must send each individual message, but rather on whether the user

(not the software) determines the *time* at which the numbers are dialed. *See Blow v. Bijora, Inc.*, 191 F. Supp. 3d 780, 788 (N.D. Ill. 2016) ("The uncontested facts show that the technology in this case does not possess . . . the *sine qua non* of a predictive dialer—the 'timing function.' The FCC considers predictive dialers to fall within the definition of an ATDS because the dialer *itself*, and not the user, decides when to call." (citation omitted) (citing 2003 Order, *supra*, ¶ 131)), *aff'd on other grounds*, 855 F.3d 793 (7th Cir. 2017);[12] *see also Ramos*, 334 F. Supp. 3d at 1275 (concluding that the EZ Texting program used by defendant "was not an ATDS" because "no text message would have been sent" if defendant "had not ultimately pressed 'send' to authorize the EZ-Texting platform to send the text message"). The *Ramos* court examined four cases dealing with EZ Texting or a similar program. *See id.* at 1274–75. In each case, the court granted summary judgment for the defendant and found that the program required too much human involvement to be an ATDS. *See Herrick v. GoDaddy.com LLC*, 312 F. Supp. 3d 792, 803 (D. Ariz. 2018) ("[Defendant] . . . had to . . . log into the system, create a message, schedule a time to send it, and perhaps most importantly, enter a code to authorize its ultimate transmission. As such, the text was not sent automatically or without human intervention and thus was not sent using an autodialer . . . ."), *appeal docketed*, No. 18-16048 (9th Cir. June 7, 2018); *Luna v. Shac, LLC*, 122 F. Supp. 3d 936, 941 (N.D. Cal. 2015) ("[H]uman intervention was involved in several stages of the process prior to Plaintiff's receipt of the text message, and was not limited to the act of uploading the telephone number to the . . . database . . . . As explained above, human intervention was involved in drafting the message, determining the timing of the message, and clicking 'send' on the website to transmit the message to Plaintiff."),

---

[12] Although the Seventh Circuit found the district court's determination that the software was not capable of dialing numbers without human intervention "premature," *see Blow*, 855 F.3d at 802, I agree with the district court's interpretation of the 2003 Order.

*appeal dismissed*, No. 15-16790 (9th Cir. Nov. 20, 2015); *see also Jenkins v. mGage, LLC*, No. 1:14-cv-2791-WSD, 2016 WL 4263937, at *5–7 (N.D. Ga. Aug. 12, 2016); *Blow*, 191 F. Supp. 3d at 788.[13]

To support his understanding of human intervention, plaintiff relies on a number of cases dealing with predictive dialers. The programs at issue in this case, however, are not predictive dialers, and the predictive-dialer cases cited by plaintiff actually support the notion that a program does not qualify as an autodialer unless a computer determines when to send the message. *See Espejo v. Santander Consumer USA, Inc.*, No. 11 C 8987, 2016 WL 6037625, at *4 (N.D. Ill. Oct. 14, 2016) (holding that "there is little [human intervention] to speak of" as the "'dialer'—not the agents—makes the calls 'by dialing numbers from the uploaded list'"); *Strauss v. CBE Grp.*, 173 F. Supp. 3d 1302, 1309 (S.D. Fla. 2016) ("To determine whether a dialer is a predictive dialing system, and therefore an ATDS, 'the primary consideration . . . is whether human intervention is required at the point in time at which the number is dialed.'" (quoting *Brown v. NRA Grp.*, No. 6:14–cv–610–Orl–31–KRS, 2015 WL 3562740, at *2 (M.D. Fla. June 5, 2015)); *In re Collecto, Inc.*, No. 14-MD-02513-RGS, 2016 WL 552459, at *4 n.9 (D. Mass. Feb. 10, 2016) (distinguishing between programs that require human intervention solely "to activate the process (by assembling a list of numbers and uploading them to the dialer)" from programs where "human intervention [is] required to *dial* the target telephones").[14] While I agree

---

[13] In *Marks*, the Ninth Circuit "conclude[d] there is genuine issue of material fact as to whether" a similar program constituted an ATDS. 904 F.3d at 1053; *see also id.* at 1048 (describing program). The *Marks* decision is not applicable to the instant matter, however, because after concluding that *ACA International* invalidated the prior FCC Orders, *see id.* at 1049, the court adopted a broad interpretation of human intervention, *see id.* at 1052–53. While *Marks* likely undermines the precedential value of *Herrick* and *Luna* within the Ninth Circuit, I continue to find these cases useful, as they analyze the human-intervention standard under the prior FCC Orders.

[14] Plaintiff also cites to *Zeidel v. A&M (2015) LLC*, No. 13-cv-6989, 2017 WL 1178150 (N.D. Ill. Mar. 30, 2017). In *Zeidel*, the court found that a "welcome" message sent automatically to customers once their information was uploaded into defendant's database may qualify as a message sent from an ATDS. *See id.* at *2, *10–11; *see also id.* at *11 (holding that "the human intervention test of the 2003 FCC Order does not inquire as to whether there is

with plaintiff that "[a]n unsolicited text delivered at, say, 5:00 PM will be equally obtrusive whether it was a human being or a computer who determined that it should be delivered then," Pl.'s Reply 16, the requirement that a computer determine the time in order for the device to qualify as ATDS is not arbitrary. The FCC decided to include predictive dialers under the statutory definition of an ATDS because "[t]he legislative history . . . suggests that through the TCPA, Congress was attempting to alleviate a particular problem—an increasing number of automated and prerecorded calls." 2003 Order, *supra*, ¶ 133. Presumably, programs with computer-run timing functions have the capability to barrage consumers at a higher rate than programs requiring more human involvement.

In sum, because a user determines the time at which the ExpressText and EZ Texting programs send messages to recipients, they operate with too much human involvement to meet the definition of an autodialer. Summary judgment for plaintiff is therefore improper. Further, since plaintiff's motion turns on whether the programs qualify as autodialers, I conclude that "all of the evidentiary materials that [plaintiff] might submit in response to a motion for summary judgment [on this issue] are before the court." *Bridgeway Corp.*, 201 F.3d at 140. Because the record reveals no material dispute as to how the programs work, and I find that the programs are not autodialers as a matter of law, a sua sponte grant of summary judgment against plaintiff is appropriate. *See id.*

---

human intervention at the entering of a 'given set of numbers' or programming of the computer system, but rather if there is human intervention at the time a call is made/placed or when a number is actually dialed" and that "[h]ere, there is no human intervention at the time the 'welcome' text is sent" (quoting *Morse v. Allied Interstate, LLC*, 65 F. Supp. 3d 407, 410 (M.D. Pa. 2014))). *Zeidel* suggests only that the initial text plaintiff received may have come from an ATDS, because the initial text was also sent automatically to plaintiff after his number was added to defendant's database. *See* Najera Dep. 36:2–11. As discussed above, because plaintiff consented to this initial text by giving his number to defendant, it is not subject to TCPA liability. *See supra* Section I. The initial text differs from defendant's subsequent texts, which required a user to select the recipients and determine "the time [the] call [was] made/placed." *Zeidel*, 2017 WL 1178150, at *11.

## CONCLUSION

For the reasons stated in this opinion, plaintiff's motion for summary judgment is denied, and summary judgment for defendant is granted sua sponte. The Clerk of Court is directed to enter judgment accordingly and close the case.

SO ORDERED.

_____/s/_____

Allyne R. Ross
United States District Judge

Dated: February 25, 2019
       Brooklyn, New York