19-600-cv
*Duran v. La Boom Disco, Inc.*

# In the
# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2019

No. 19-600-cv

RADAMES DURAN, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY
SITUATED,
*Plaintiff-Appellant,*

v.

LA BOOM DISCO, INC.,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Eastern District of New York

SUBMITTED: DECEMBER 13, 2019
DECIDED: APRIL 7, 2020

Before: CABRANES and LOHIER, *Circuit Judges*, and REISS, *District
Judge*.*

* Judge Christina Reiss, of the United States District Court for the District of
Vermont, sitting by designation.

CERTIFIED COPY ISSUED ON 04/07/2020

————————

Plaintiff-Appellant Radames Duran ("Duran") claims that he received, over the course of more than a year-and-a-half, hundreds of unsolicited text messages from Defendant-Appellant La Boom Disco, Inc. ("LBD"), all sent using Automatic Telephone Dialing Systems ("ATDSs") in a way prohibited by the Telephone Consumer Protection Act of 1991 ("TCPA"). LBD acknowledges that it sent the messages, but counters that its actions were not prohibited by the TCPA because the texting platforms used to send them were not, in fact, ATDSs. Of course, only one party can be right: either LBD used ATDSs, or it did not. If LBD did do so, then it is liable to Duran under the TCPA. But if LBD did not do so—if it used some non-ATDS technology to send its texts—then Duran has no case.

Duran appeals from a grant of summary judgment in the U.S. District Court for the Eastern District of New York (Allyne R. Ross, *Judge*) in favor of LBD. To qualify as an ATDS, a dialing system must have both the capacity "to store or produce telephone numbers to be called, using a random or sequential number generator[,]" 47 U.S.C. § 227(a)(1)(A), and the capacity "to dial such numbers[,]" id. § 227 (a)(1)(B). The District Court concluded that the dialing systems used by LBD meet only the first of these two statutory requirements and therefore are not ATDSs. Because we determine that LBD's systems meet both statutory requirements, we conclude that the systems qualify as ATDSs. Accordingly, we **VACATE** the District Court's judgment and **REMAND** the cause for further proceedings consistent with this opinion.

—————

C.K. Lee, Lee Litigation Group, PLLC, New York, NY, *for Plaintiff-Appellant*.

Raymond J. Aab, New York, NY, *for Defendant-Appellee*.

—————

JOSÉ A. CABRANES, *Circuit Judge*:

In 1991, Congress set out to cure America of that "scourge of modern civilization": telemarketing.[1]  Alarmed that unsolicited advertising calls were inundating the phones of average Americans, it passed the Telephone Consumer Protection Act ("TCPA"),[2] prohibiting certain kinds of calls made without the recipient's prior consent.  Specifically, the TCPA permits a recipient to sue any caller if that caller used an automatic telephone dialing system ("ATDS") to reach the recipient's cell phone, with some exceptions.[3] By creating such a private cause of action, the hope was that telemarketers would

———

[1] These oft-quoted words come from the Telephone Consumer Protection Act's lead sponsor, Senator Ernest F. Hollings. Painting the picture more fully, Senator Hollings noted that telemarketers "wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall." 137 Cong. Rec. 30,821 (1991).

[2] 47 U.S.C. § 227.

[3] *See id*. § 227(b)(1), (3).

3

be deterred from undertaking ATDS-fueled advertising campaigns—and that American cell phone users would have fewer "rings" and "buzzes" interrupting their days.

Predictably, the TCPA has created much litigation from consumers seeking to redress the all-too-common injury of having received an unwanted phone call or text message.[4] But what is at heart a straightforward law—giving individuals a right to sue for this kind of intrusive advertising—has become complex to enforce.

This is because of a simple definitional question that pervades TCPA litigation in our Circuit and others: what exactly is an ATDS?[5]

It is this very question that is before us here.

---

[4] It is undisputed that "[a] text message to a cellular telephone . . . qualifies as a 'call' within the compass of [the TCPA]." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 667 (2016). Moreover, an unwanted text message is, for standing purposes, an injury-in-fact. *See Melito v. Experian Mktg. Solutions, Inc.*, 923 F.3d 85, 93 (2d Cir. 2019) (noting that "text messages, while different in some respects from the receipt of calls or faxes specifically mentioned in the TCPA, present the same 'nuisance and privacy invasion' envisioned by Congress when it enacted the TCPA").

[5] A split has recently emerged on precisely this question, with several Courts of Appeals reaching different conclusions on whether an ATDS can pull numbers from a stored list when it automatically dials, or whether it must randomly or sequentially generate those numbers. The Ninth Circuit, which we follow here, concluded that an ATDS can, indeed, make calls from stored lists. *See Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018). The Seventh, Eleventh, and Third Circuits have concluded otherwise. *See Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458 (7th Cir. 2020); *Glasser v. Hilton Grand Vacations Co.*, 948 F.3d 1301 (11th Cir. 2020); *Dominguez v. Yahoo, Inc.*, 894 F.3d 116 (3d Cir. 2018).

Plaintiff-Appellant Radames Duran ("Duran") claims that he received, over the course of more than a year-and-a-half, hundreds of unsolicited text messages from Defendant-Appellee La Boom Disco ("LBD"), a nightclub in Queens, New York, all sent using ATDSs. LBD acknowledges that it sent the messages, but counters that its actions were not prohibited by the TCPA because the texting platforms it used to send them were not, in fact, ATDSs. Of course, only one party can be right: either LBD used ATDSs, or it did not. If LBD did do so, then it is liable to Duran under the TCPA. But if LBD did not do so—if it used some non-ATDS technology to send its texts—then Duran has no case.

So which is it?

## I. BACKGROUND

To arrive at a conclusion, we must start by going back to March 2016, when Duran first took a trip out to the club.

Around that time, Duran had seen an LBD Facebook advertisement inviting interested club-goers to text a code to a designated phone number in order to secure free admission to a party, which he voluntarily did. From that point on, his number was on a list that LBD maintained, and he would receive, according to his complaint, "anywhere from 7 to 15 messages a month" totaling "at least 300 unsolicited text messages" overall.[6] These text messages,

---

[6] App. 16.

5

some of which were produced for the District Court, featured advertisements for LBD, describing events that would take place there.

Over a year-and-a-half after the texts started, Duran brought a putative class action against LBD in the United States District Court for the Eastern District of New York (Allyne R. Ross, *Judge*), on behalf of himself and others similarly situated, seeking damages under the TCPA for each message received. He claimed that the messages were sent without his consent and that they were sent using an ATDS, triggering TCPA-liability.

LBD responded by denying that it violated the TCPA. It conceded that the texts were sent (though by its count, there were only 121, not somewhere near 300). Still, LBD argued that no matter the number, the messages were properly conveyed, since the technologies used to send them were not covered by the statute. As LBD explained, it sent the messages using two online systems: the ExpressText and EZ Texting Programs (jointly, the "programs"). Although these programs permitted LBD to blast out text messages to hundreds of numbers at once, they were not ATDSs, according to LBD, because, among other things, they required too much human intervention when dialing. Contrary to Duran's claims, LBD argued that the programs lacked the critical feature of those dialing systems regulated by the TCPA. Simply put, they were not *automatic*.

The District Court agreed.[7] It granted summary judgment for LBD, deciding that the programs LBD used to text Duran were not, as a matter of law, ATDSs. In making its determination, the District Court concluded that what sets apart an ATDS from a non-ATDS is whether a human determines the time at which a text message gets sent out. Accordingly, it held that "because a user determines the time at which the ExpressText and EZ Texting programs send messages to recipients, they operate with too much human involvement to meet the definition of an autodialer."[8]

Duran appealed to this Court, seeking *vacatur* of the judgment on the basis that the District Court misinterpreted the TCPA. Since Duran's appeal presents a pure question of statutory interpretation, we now review the District Court's judgment *de novo*, coming to our own conclusion about what an ATDS is.[9]

---

[7] *Duran v. La Boom Disco, Inc.*, 369 F. Supp. 3d 476 (E.D.N.Y. 2019).

[8] *Id.* at 492.

[9] *See United States v. Williams*, 733 F.3d 448, 452 (2d Cir. 2013) ("Interpretations of statutes are pure questions of law, and we therefore review [them] *de novo*. . . .").

7

## II. DISCUSSION

Generally, the TCPA prohibits the use of ATDSs to produce unwanted phone calls or text messages.[10] Individuals who receive ATDS-generated calls or text messages can sue the sender under the TCPA for at least $500 for each unwanted call or text—and perhaps more if the sender knowingly violates the statute.[11]

In determining whether a dialing system qualifies as an ATDS, we begin, as we must, with the language of the statute.[12] According to the TCPA, a dialing system qualifies as an ATDS if it has two concurrent capacities. First, it must have the "capacity . . . to store or produce telephone numbers to be called, using a random or sequential

---

[10] "It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—(i) to any emergency telephone line . . . ; (ii) to the telephone line of any guest room or patient room of a hospital . . . ; (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States . . . ." 47 U.S.C. § 227(b)(1).

[11] *Id.* § 227(b)(3).

[12] *See Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 412 (2012) ("We begin where all such inquiries must begin: with the language of the statute itself." (internal quotation marks omitted)).

number generator[.]"[13] Second, it must have the "capacity . . . to dial such numbers."[14]

But this statutory language leaves much to interpretation. If the numbers are stored, must they be stored "using a random or sequential number generator" (whatever that might mean)? Or is it only that the numbers may be *produced* using such a number-generator, and that they can be stored in any way possible?

And what does it mean that the ATDS must be able to "dial such numbers" that have been stored or produced? If a human clicks "send" in a dialing system in order to initiate a call or text message campaign—one in which thousands of calls and texts are sent out at once—is it the case that the human "dialed" each number? Or did the dialing system dial on its own, thereby qualifying as an ATDS?

These technical questions are not easily resolved. They require close attention to Congress's intent, as expressed in the particular language of the statute, as well as to the interpretation of the statute over the last two decades by the Federal Communications Commission ("FCC").

As explained above, LBD argues that its programs are not ATDSs, since they lacked both capacities required by the statute, and the absence of either one is sufficient to render the programs non-ATDSs. Duran argues the opposite—that the programs had the

---

[13] 47 U.S.C. § 227(a)(1)(A).

[14] *Id.* § 227(a)(1)(B).

capacity to both store numbers and to dial them, and thus qualify as ATDSs.

We review these claims in turn, first assessing (1) whether LBD's programs had the "capacity . . . to store or produce telephone numbers to be called, using a random or sequential number generator[,]" and then (2) whether they had the "capacity . . . to dial such numbers."

### (1) The "capacity . . . to store or produce telephone numbers to be called, using a random or sequential number generator"

Did LBD's ExpressText and EZ Texting programs have the "capacity . . . to store or produce telephone numbers to be called, using a random or sequential number generator"?

There are *at least* two ways of answering this question, each based on a different approach to interpreting the statute.[15]

The first approach suggests that the programs lacked this first capacity required to be ATDSs because they only dialed numbers from prepared lists—that is, from lists that had been generated and uploaded to the programs by humans. Since such prepared lists are not, according to this interpretation, "store[d] or produce[d]" with the

---

[15] We note that there are "at least" two ways to interpret the statute because the Seventh Circuit showed that there are as many as four (and possibly more). *See Gadelhak*, 950 F.3d at 463–64. However, we focus on the two interpretations that, in our view, arise most naturally from the statute's language, and that have been adopted by our sister circuits. *Compare id.* at 460 (adopting the first approach) *and Glasser*, 948 F.3d at 1306 (same) *with Marks*, 904 F.3d at 1052 (adopting the second approach).

use of a "random or sequential number generator[,]" their use renders both programs, by definition, non-ATDSs.

The second approach suggests that both programs had the first capacity required to be considered ATDSs. According to this approach, the clause requiring the use of "a random or sequential number generator" modifies only the verb "produce" in the statute, but not the word "store." This means that the numbers to be called by an ATDS may be "stored" *or* they may be "produced," but only if they are produced must they come from "a random or sequential number generator[.]" Since the numbers here are "stored" by the programs, they are not, under this interpretation, subject to the requirement that they be randomly or sequentially generated. Rather, the mere fact that the programs "store" the lists of numbers is enough to render them ATDSs.

Since both parties agree that the numbers were generated by humans and uploaded to the programs, we must decide whether the statute tolerates such activity by an ATDS.  If we read the statute to mean that, in order for a program to qualify as an ATDS, the phone numbers it calls must be stored using a random- or sequential-number-generator or produced using a random- or sequential-number-generator, then we must conclude that LBD's programs are not ATDSs, since the programs called numbers stored in a human-generated list. But if we read the statute to mean that, in order for a program to qualify as an ATDS, the phone numbers it calls must be either stored in any way or produced using a random- or sequential-

number-generator, then we must conclude that the programs here can qualify as ATDSs.

On *de novo* review, we conclude, for several reasons, that the second approach to the statute's interpretation is correct, and that the programs here have the first capacity required to be ATDSs—the "capacity . . . to store or produce telephone numbers to be called, using a random or sequential number generator[.]"

**(a)**

To begin with, the second interpretation of the statute avoids rendering any word in the statute "surplusage."[16] The potential problem of surplusage in the TCPA becomes apparent when considering how the first approach to interpreting it would work. As discussed above, under the first approach, an ATDS would need to be able either to "store" or "produce" numbers using a random- or sequential-number-generator. But what this approach cannot explain is why the statute, in order to achieve its ends, includes both verbs. Common sense suggests that any number that is stored using a number-generator is also *produced* by the same number-generator;

---

[16] *See, e.g., Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029, 1037 (2019) (noting that courts "generally presum[e] that statutes do not contain surplusage" (quoting *Arlington Central School Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 299, n.1. (2006) (alteration in original)); *see also Corley v. United States*, 556 U.S. 303, 314 (2009) (noting that "one of the most basic interpretative canons" is that a "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant" (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (internal quotation marks omitted from second quotation))).

otherwise, it is not clear what "storing" using a number-generator could mean.[17] It would be odd for Congress to include both verbs if, together, they merely created redundancy in the statute. "Where possible we avoid construing a statute so as to render a provision mere surplusage[,]" deferring instead to another interpretation of the statute if one exists.[18]

Fortunately, another interpretation of the statute *does* exist here. Following this other approach, the verbs "store" and "produce" take on different meanings, since "produce" is modified by the clause after the comma in the statute—"using a random or sequential number generator"—while "store" is not. Under this approach, a dialing system can be an ATDS if it can "store" numbers, even if those numbers are generated elsewhere, including by a non-random- or non-sequential-number-generator—such as a person. At the same time, a dialing system can be an ATDS if it can "produce" numbers "using a random or sequential number generator[.]" This interpretation, accordingly, rescues the statute from the problem of surplusage: each verb is independently significant to the creation of a comprehensive statute, one that regulates dialing systems that can store numbers of all kinds or that can produce numbers in a particular way (randomly or sequentially).

---

[17] Other courts have come up with unsatisfactory answers to this surplusage problem. *See, e.g.*, *Glasser*, 948 F.3d at 1307 (noting that there is "some redundancy between store and produce" because "a device that produces telephone numbers *necessarily* stores them," but tolerating that redundancy nonetheless).

[18] *Burrus v. Vegliante*, 336 F.3d 82, 91 (2d Cir. 2003).

**(b)**

The purpose and structure of the TCPA further reinforce our interpretation of the plain language of the statute. For instance, although the TCPA creates a general prohibition on ATDS calls and texts, it does provide several exceptions for when an ATDS may be appropriately used. Under one such exception, an ATDS may be used in order "to collect a debt owed to or guaranteed by the United States[.]"[19]

But does that mean that an ATDS must reach such debtors only by calling numbers derived from random- or sequential-number-generators? That result is highly unlikely, for it would be highly inefficient—requiring the Government to call numbers haphazardly until it luckily found someone who owed it money.

Instead, the only way this exception makes sense is if an ATDS can make calls or texts using a human-generated list of phone numbers.[20] Indeed, in creating the exception, Congress clearly

---

[19] 47 U.S.C. § 227(b)(1)(A)(iii).

[20] The Eleventh Circuit addressed this argument by noting that the statute also prohibits calls using a prerecorded or artificial voice—and that these calls are the ones Congress was permitting when it amended the TCPA to allow debt-collection calls, not calls from an ATDS. *See Glasser*, 948 F.3d at 1311-12. But the language of the statute does not make that distinction. And, arguably for that reason, the FCC, when promulgating new rules to explain the debt-collection exception, specifically noted that the "exception . . . allows the use of an *autodialer*, prerecorded-voice, and artificial-voice when making calls[,]" not just prerecorded- or artificial-voice as the Eleventh Circuit suggests. *In re Rules and Regulations*

recognized that ATDSs can store lists of such numbers—*i.e.*, the numbers of debtors—so that they can be effectively used in order to collect Government debts.

Accordingly, if ATDSs are permitted to store lists of human-generated numbers for the purpose of making debt-collection calls, and because Congress did not authorize the use of stored lists solely for that purpose, it must follow that Congress also expected and thus permitted ATDSs to be able to store lists of human-generated numbers *generally*.

**(c)**

The aptness of this interpretive approach is also confirmed by the FCC's consistent interpretation of the TCPA,[21] including in the

---

*Implementing the Telephone Consumer Protection Act of 1991*, 31 FCC Rcd. 9074, 9116 (2016) (emphasis added).

[21] The TCPA expressly authorizes the FCC to "prescribe regulations to implement the requirements" of the statute. 47 U.S.C. § 227(b)(2).

We need not decide what degree of deference, if any, we owe to FCC Orders interpreting the TCPA (a question the Supreme Court recently raised, but did not answer, in *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2055 (2019) (asking whether a 2006 Order interpreting the TCPA is equivalent to a legislative or an interpretive rule)). Instead, we merely treat the FCC Orders as persuasive authority, providing further confirmation for the interpretation that, as set forth in section (a) of this opinion, is commanded by the text of the statute.

rules it promulgated pursuant to the TCPA in 2003,[22] 2008,[23] and 2012.[24] While other courts have claimed that those rules were invalidated by our decision in *King v. Time Warner Cable Inc.*[25] and the D.C. Circuit's decision in *ACA International v. Federal Communications Commission*[26]—the latter of which did, in fact, set aside a portion of the 2015 FCC rules that had been issued on ATDSs[27]—this is not the case. To the contrary, the 2003, 2008, and 2012 Orders, among others, survived our decision in *King* and the D.C. Circuit's decision in *ACA International*, and continue to inform our interpretation of the TCPA today.[28]

---

[22] *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14,014 (2003) ("2003 Order").

[23] *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559 (2008) ("2008 Order").

[24] *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 15,391 (2012) ("2012 Order").

[25] 894 F.3d 473 (2d Cir. 2018).

[26] 885 F.3d 687 (D.C. Cir. 2018).

[27] *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015) ("2015 Order").

[28] The District Court in the instant case reached the correct conclusion on this issue, arguing that *King* did not invalidate the pre-2015 Orders. *See Duran*, 369 F. Supp. 3d at 486-89. Not only did we not mention the 2003, 2008, and 2012 Orders in our *King* decision, but we specifically declined to consider the interpretation of the term "automatic telephone dialing system"—which those Orders help to clarify. Instead, we limited our analysis in *King* to the interpretation of the word "capacity" as it appears in the TCPA.

The FCC has long suggested that the TCPA be interpreted broadly—in such a way that it covers systems which dial from stored lists—so that the statute's prohibitions maintain their general deterrent effect on telemarketers, even when telemarketers switch to newer non-random- or non-sequential-number-generating technology. For example, in 2003, the FCC endorsed just such a broad interpretation when it said that "[w]e believe the purpose of the requirement that equipment have the 'capacity to store or produce telephone numbers to be called' is to ensure that the prohibition on autodialed calls not be circumvented."[29] It made this statement in the context of explaining that the statute applies to "predictive dialers"—dialing systems that make calls or send texts from preset "database[s]

---

Furthermore, while it is true that *ACA International* noted that the 2015 Order contained an apparently self-contradictory explanation of what an ATDS could be, its decision to set aside the 2015 Order did not invalidate any prior Orders. The problem with the 2015 Order's definition of an ATDS, according to the D.C. Circuit, is that it at once suggested that ATDSs *cannot* call from stored lists and that they also *can* call from stored lists. As the D.C. Circuit said, either interpretation could work, but not both interpretations simultaneously. *ACA Int'l*, 885 F.3d at 702-03. However, as we discuss below, the earlier Orders do not suffer from the same internal contradiction, since they are clear that ATDSs *can* dial from stored lists. As a result, there is no reason to think that the D.C. Circuit's decision to invalidate the 2015 Order on this ground also invalidated those that came before it.

[29] 2003 Order, at 14,092-93. The FCC stated that to permit calling from stored lists, just because they were produced by a human rather than a number-generator, "would lead to an unintended result. Calls to emergency numbers, health care facilities, and wireless numbers would be permissible when the dialing equipment is paired with predictive dialing software and a database of numbers, but prohibited when the equipment operates independently of such lists and software packages." *Id.* at 14,092.

of numbers" rather than by generating numbers on their own.[30] In so stating, the FCC made clear that a dialing system that merely stores a list of numbers, even if it does not store or produce it using a random- or sequential-number-generator, can still qualify as an ATDS.

As the FCC additionally clarified in 2012, the statutory definition of an ATDS "covers any equipment that has the specified *capacity* to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated *or come from calling lists*."[31] The FCC's interpretation of the statute is consistent with our own, for only an interpretation that permits an ATDS to store numbers—no matter how produced—will also allow for the ATDS to dial from non-random, non-sequential "calling lists." As the FCC implied, it does not matter that the lists are produced by human-generators rather than mechanical number-generators. What matters is that the system can store those numbers and make calls using them.

**(d)**

For all of these reasons—to avoid the problem of surplusage, to effectuate Congress's intent in passing the statute as enacted, and to follow the FCC's long-standing and still valid interpretation of the TCPA—we hold that an ATDS may call numbers from stored lists, such as those generated, initially, by humans. Since there is no factual

---

[30] *Id.* at 14,091.

[31] 2012 Order, at 15,392, n.5 (latter emphasis added).

18

dispute that the ExpressText and EZ Texting programs call from just such lists of numbers, they, too, have the first capacity—the capacity to "store" numbers—required under the TCPA to be considered ATDSs.

### (2) The "capacity . . . to dial such numbers"

The next question is whether the ExpressText and EZ Texting programs also have the second capacity required by the statute to be ATDSs—the "capacity . . . to dial such numbers."

The FCC has stated that this capacity exists when the dialing system can "dial numbers without human intervention."[32] Indeed, this ability to dial without human intervention is an ATDSs' "basic function."[33] But determining how much human intervention is too much for a system to qualify as an ATDS is not always easy. Any system—ATDSs included—will always require *some* human intervention somewhere along the way, even if it is merely to flip a switch that turns the system on.

LBD argues that the programs at issue can only dial with a level of human intervention that makes them non-automatic. Specifically, LBD argues that the programs are not ATDSs because they require a human to upload the message to be sent, to determine the time at which the message gets sent, and to manually initiate the sending. The District Court agreed, finding the second factor—that a human

---

[32] 2003 Order at 14,092; *see also* 2012 Order, at 15,392, n.5.

[33] 2003 Order at 14,092.

determined the time at which the messages were sent out—to be dispositive.

Duran argues, to the contrary, that the programs do not dial with "human intervention," but do so automatically. Even though a human manually initiates the text campaign and determines the time at which the campaign takes place, the actual dialing—the connecting of one phone to another—occurs entirely by machine. Therefore, by his interpretation, the programs are both ATDSs.

We are thus asked to decide how much intervention is tolerable under the statute before an ATDS becomes a non-ATDS. We conclude that Duran is correct, and that the programs here are both ATDSs.

**(a)**

In trying to develop some criteria for what constitutes too much human intervention, the District Court decided that the most important factor was whether a human determined the time at which a dialing system sent out a call or text.[34] It derived this factor, it said, from the FCC's 2003 Order—the very one that interpreted the TCPA to cover "predictive dialers," which call from stored lists of numbers. According to that Order, "the principal feature of predictive dialing software is a timing function," as predictive dialers dial "at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call."[35] Thus, the District Court seems to have

---

[34] *See Duran*, 369 F. Supp. 3d at 490.

[35] 2003 Order at 14,091.

concluded that the principal feature of all ATDSs must also be a timing function—or else predictive dialers would not be considered ATDSs. Indeed, it stated that "the human-intervention test turns not on whether the user must send each individual message, but rather on whether the user (not the software) determines the *time* at which the numbers are dialed."[36]

We do not agree that the human-intervention test turns solely on this timing factor. While it may be true, as the 2003 Order states, that the key feature of a predictive dialer is a timing function, the programs used by LBD here are not predictive dialers, a fact that the District Court readily acknowledges.[37] Therefore, any controlling reliance on the fact that LBD's programs do not automatically determine the time at which messages are sent out is misplaced. The District Court, in stressing the importance of the "timing function" to the human-intervention test, seems to imply that *only* predictive dialers can be considered ATDSs. But the TCPA predates the use of predictive dialers—which is exactly why the FCC felt compelled to specify its application to this new technology in 2003. To assume that a key feature of predictive dialers must be a key feature of all ATDSs, especially when we know that many early ATDSs did not have the ability to automatically determine the time at which a call or text would get sent out, is anachronistic at best.

---

[36] *Duran*, 369 F. Supp. 3d at 490 (emphasis in original).

[37] *See id.* at 491.

**(b)**

There must be some other criterion, then, that guides the "human intervention" analysis. To locate one, we look to the statutory text and the FCC's commentary, which both specify that an ATDS is different from a non-ATDS merely because of its ability to "dial" numbers automatically or, as the FCC has put it, without human intervention.

But what does it mean to dial? Dialing a phone, after all, is not the same as it used to be. Although the verb "to dial" may have originally meant to rotate an actual dial, it is more commonly used today to refer to the specific act of "inputting" some numbers to make a telephone operate, and to connect to another telephone. By 2014, the Oxford English Dictionary was able to confirm this common usage, noting that to dial generally means "[t]o enter (one or more digits or letters) by turning the disc of a telephone dial or (later) by pushing buttons on a keypad or touch screen to make a telephone call[.]"[38]

Merely clicking "send" or an equivalent button in a text messaging program—much like the programs at issue here—is not the same thing as dialing a number. When a person clicks "send" in such a program, he may be instructing the system to dial the numbers, but

---

[38] *Dial*, Oxford English Dictionary (3d ed. 2014).

he is not actually dialing the numbers himself. His activity is one step removed.[39]

Indeed, if it were otherwise—if merely clicking "send" on its own amounted to dialing—then it is hard to imagine how any dialing system could qualify as automatic. Presumably, when one uses a dialing system, a "send" button or an "initiate phone campaign"

---

[39] Critics of our approach may suggest that our definition of "dial" is out of step with common usage. After all, many people now use so-called smartphones to call or text their "contacts," and they often do so without directly "inputting" any specific numbers—but instead by merely selecting a "contact" from a digital phonebook or by asking Siri or Alexa to accomplish the task. These critics may suggest that, by relying on an antiquated notion of "dialing," we are unintentionally defining all smartphones as ATDSs, since clicking on a name in a digital phonebook to make a phone call or send a text message looks the same as clicking "send" to initiate a text campaign. No inputting of numbers takes place.

But, in fact, these operations are quite different. Clicking on a name in a digital phonebook to initiate a call or text is a form of speed-dialing or constructive dialing that is the functional equivalent of dialing by inputting numbers. When we save a contact in a smartphone, we are merely instructing the phone to replace the 10-digit phone number with a single button (i.e. one can click on the name "John" to accomplish the same task as inputting all 10 digits of John's number). The contact card in a smartphone is a proxy or a shortcut for a number (just like the single digit "0" was traditionally a proxy for dialing the operator). When one clicks on the card, one is constructively dialing the attached number. Therefore, when one sends a text message using a smartphone—which involves clicking on the card and *then* clicking a "send" button—one has already accomplished the dialing.

However, when one clicks on the "send" button in the programs at issue here, one is not dialing a particular attached number beforehand or afterwards. Simply put, the "send" button, unlike a contact card, is not a short-cut for dialing a particular person. Rather, clicking "send" is accomplishing a different task altogether: it is telling the ATDS to go ahead and dial a separate list of contacts, often numbering in the hundreds or thousands.

button—or even merely an "on" switch—must be operated by a human somewhere along the way. Under LBD's approach, any such operation might be enough to remove the dialing system from the ATDS category, since there would be too much human intervention for the dialing system to be truly automatic. But this approach seems to defy Congress's ultimate purpose in passing the TCPA, which was to embrace within its scope those dialing systems which can blast out messages to thousands of phone numbers at once, at least cost to the telemarketer.

We thus recognize that clicking "send" or some similar button—much like flipping an "on" switch—is not the same thing as dialing, since it is not the actual or constructive inputting of numbers to make an individual telephone call or to send an individual text message. Clicking "send" does not require enough human intervention to turn an automatic dialing system into a non-automatic one.

Accordingly, since the programs here required only a human to click "send" or some similar button in order to initiate a text campaign, we conclude that the programs did not require human intervention in order to dial. Therefore, LBD's programs have the second capacity necessary to be considered ATDSs. They both can dial numbers on their own—which is to say, *automatically*.

## III. CONCLUSION

To summarize, we hold as follows:

(1) The EZ-Texting and ExpressText programs have the first "capacity" necessary to qualify as automatic telephone dialing systems, or ATDSs, because they store lists of numbers, as is permitted under the Telephone Consumer Protection Act;

(2) The EZ-Texting and ExpressText programs have the second "capacity" necessary to qualify as automatic telephone dialing systems, or ATDSs, because they dial those stored numbers without human intervention, as is required by the Telephone Consumer Protection Act;

(3) Having both necessary "capacities" within the meaning of the Telephone Consumer Protection Act, the EZ-Texting and ExpressText programs are automatic telephone dialing systems, or ATDSs, under the statute.

Accordingly, we **VACATE** the District Court's judgment and **REMAND** the cause for further proceedings consistent with this opinion, including the calculation of such penalties as may be appropriate in the circumstances presented.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

25